1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FILED & ENTERED

JUL 12 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Fisher      DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>John Michael Licursi<br>Susan Annette Licursi<br><br><br>                                    Debtors. | CHAPTER 7<br><br>Case No.:  1:10-bk-26168-GM<br>Adv No:   1:15-ap-01236-GM<br><br>**MEMORANDUM OF OPINION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, OR, ALTERNATIVELY, PARTIAL SUMMARY ADJUDICATION REGARDING NONDISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523** |
| California Bank & Trust<br><br>                                    Plaintiff,<br><br>    v.<br><br>John Michael Licursi, Susan Annette Licursi<br><br><br>                                    Defendants. | Date:         June 27, 2017<br>Time:        10:00 a.m.<br>Courtroom:  303<br>                    21041 Burbank Blvd.<br>                    Woodland Hills, CA 91367 |

Plaintiff ZB, N.A. dba California Bank & Trust ("Plaintiff" or "CB&T") moves for summary judgment against Defendants John and Susan Licursi ("Defendants," "Debtors," or the "Licursis" and individually as "John" and "Susan") in this nondischargeability action under Bankruptcy Code §§ 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6).  CB&T seeks judgment against the Licursis in the amount of $602,652.91 plus attorneys' fees and costs exceeding $300,000.  Alternatively, CB&T requests the Court enter partial summary judgment against Defendants for each of the elements under §§ 523(a)(2), (a)(4), and (a)(6) for which CB&T has established that no genuine issues of material fact exists.

**CB&T's Motion for Summary Judgment:**

CB&T and the Licursis agree to the following undisputed facts:[1]

1. On September 25, 2008, Alliance Bank and Spectrum Glass & Aluminum ("Spectrum Aluminum") entered into a business loan agreement and related documents including a Commercial Security Agreement ("Loan Agreement") whereby Alliance Bank provided Spectrum Aluminum with a loan in the amount of $393,892. [SSGI #1-3]

2. Also on September 25, 2008, John Licursi made, executed, and delivered a Commercial Guaranty of the Loan and both Susan and John Licursi made, executed and delivered a Commercial Guaranty as trustees for the John and Susan Licursi 2005 Trust. [SSGI #10, 11]

---

[1] Unless otherwise noted, these undisputed facts are gleaned from the Defendants' Separate Statement of Genuine Issues...dkt. #41 and identified as "SSGI # --."  Exhibits attached to the Declaration of Michael Muse-Fisher are identified as "Muse-Fisher, dkt. 27, Ex. _, p. _"  Exhibits attached to the Declaration of Michael Toal are identified as "Toal, dkt.28, Ex. _, p. _"  Exhibits attached to the Appendix of Transcripts are identified as "Appendix, dkt. 29, Ex. _, p. _."  Disputed facts or comments by the Court are in italics.

3. On May 23, 2005, Alliance had filed a U.C.C. Financing Statement with the Delaware Department of State and with the California Secretary of State.  This covered the Collateral, which consists of all inventory, equipment, accounts, money, general intangibles, etc., as well as proceeds thereof.  The Collateral does not include motor vehicles.  [SSGI ##5, 6; Toal, dkt. 28, Ex. 5, 6, pp. 33-37.] [*Per the Toal Declaration, dkt. 28, par. 9, there was a prior revolving line of credit between Spectrum Aluminum and Alliance, which was converted into a five year loan in September 25, 2008.  Thus, it appears that the 2005 U.C.C. arose as part of the documentation for the line of credit.  The Licursis do not dispute the validity or effect of these Financing Statements.*]

4. On February 6, 2009, CB&T acquired the assets of Alliance from the FDIC. On January 28, 2010, CB&T filed a UCC Financing Statement Amendment in Delaware and in California, identifying CB&T as the secured party. [SSGI ##7-9]

5. On June 1, 2009, Spectrum Aluminum defaulted under the terms of the Loan Agreement by failing to make the payment due, as well as all other payments due thereafter. [SSGI #12]

6. During the next months, CB&T and Spectrum Aluminum attempted to reach an agreement, but none was arrived at. [SSGI #14]

7. On May 28, 2010, CB&T filed a lawsuit in the Los Angeles Superior Court against Spectrum Aluminum and the Licursis for breach of contract, conversion, money due, and account stated.  LASC Case # BC438702.  This accelerated the balance due under the Loan Agreement and sought immediate delivery of possession of the Collateral. [SSGI #15]

8. On May 18, 2010, the Licursi Trust, John and Susan Licursi, and Spectrum Aluminum filed a complaint against Alliance Bank, CB&T, and Zion's First National Bank to reform the loan documents – at least concerning the real property at 1801 W. Burbank Blvd., Burbank, CA.  Spectrum Aluminum did business at this address. LASC EC053012 [Muse-Fisher, dkt. 27, ex. 3, 4; SSGI ##26, 42]

9. On June 4, 2010, Spectrum Aluminum filed bankruptcy but the bankruptcy was dismissed on July 8, 2010 because Spectrum Aluminum failed to retain counsel. 2:10-bk-32803-BB.. [SSGI ##22, 27]

10. In the Spectrum Aluminum bankruptcy, John Licursi was identified as the owner of 100% of Spectrum Aluminum, a construction company specializing in glass and window installation.  He was also identified as a director, president, secretary, and CFO. [2:10-bk-32803, dkt. 10, p. 31]

11. Spectrum Aluminum failed to include CB&T as a creditor on its bankruptcy schedules and CB&T received no notice of the bankruptcy.  [SSGI ##23-25]

12. On December 28, 2010, the Licursis filed the instant bankruptcy case which stayed the Spectrum Aluminum state court case against the Debtors only, but not as to Spectrum Aluminum.

13. On December 31, 2010, John dissolved Spectrum Aluminum.  [SSGI #56]

14. On January 18, 2011, the Superior Court entered judgment against Spectrum Aluminum in the total amount of $418,195.21 and for recovery of the Collateral. This judgment is still outstanding and interest is accruing at 10% per annum. [LASC BC438702; SSGI ##17, 19]

15. On January 19, 2010, Spectrum Glass & Mirror ("Spectrum Mirror") was incorporated.  At that time, John and Susan were the sole shareholders of Spectrum Mirror, jointly owning 100% of the shares.  They also were the sole directors and Susan was president and CEO while John was treasurer, secretary, and CFO. [SSGI ##30-33]

16. After the formation of Spectrum Mirror, in 2010 and 2012 Susan signed documents with HSBC Bank certifying that she was the secretary of Spectrum Mirror and that John was the president.  John also signed these representations.  They also stated that John was the 100% shareholder of Spectrum Mirror.  [*These were untrue statements at the time that they were made.*] [SSGI #45; Muse-Fisher, dkt. 27-2, ex. 23, pp. 7-18]

17. On February 1, 2010, Spectrum Aluminum entered into an Asset Purchase Agreement ["APA"] with Spectrum Mirror whereby Spectrum Mirror purchased the assets of Spectrum Aluminum. [SSGI #34]  Susan signed the APA under the surname "Marshall," which was a name she used in some other contexts. [SSGI #35]

18. Spectrum Aluminum retained CMA Auction & Appraisal Services, which prepared an appraisal as of April 15, 2010 in the total amount of $25,710 (+/- 10%), based on "forced auction value."  [SSGI #36]  [*There is a dispute as to whether using a "forced auction value" was the independent decision of CMA, but no evidence has been put forward to the contrary.*]

19. Although the Asset Purchase Agreement included intellectual property such as trade names and web designs and domains, these were not reflected in the CMA appraisal.  Goodwill was valued at $0. [Appendix, dkt. 29-2, p. 28 et. seq]

20. On April 15, 2010, most assets of Spectrum Aluminum were transferred to Spectrum Mirror, free and clear of liens, via a Bill of Sale signed by John Licursi. Spectrum Aluminum retained contracts in progress as well as the accounts receivable that those would generate. [SSGI ##38, 39]

21. CB&T was not aware of the transfer until September 2012 and never consented to the transfer.  None of the collateral was ever turned over to CB&T. [SSGI ##70, 71, 73]

22. After the transfer, CB&T retained a lien on the proceeds of its Collateral. [Toal, dkt. 28, Ex. 5, 6, p. 33-37]  In Defendant's Undisputed Facts they contend that the security interest also covered "replacement assets." [Defendants' Undisputed Facts, dkt. 41, #89]

23. The exact amount that Spectrum Mirror paid for the assets is disputed, but it was approximately $25,715.  Spectrum Mirror did not pay money directly to Spectrum Aluminum, but undertook some obligations of Spectrum Aluminum and paid off some of the creditors of Spectrum Aluminum.  No payment was made on the CB&T obligation. [SSGI #40]

24. On May 1, 2010, the Licursis executed a lease agreement to Spectrum Mirror for 1801 Burbank Blvd., Burbank, CA pursuant to which Spectrum Mirror assumed the lease of Spectrum Aluminum and then sublet one-half of the property back to Spectrum Aluminum.  From the time that it was incorporated, Spectrum Mirror has done business at 1801 Burbank Blvd., Burbank, CA. [SSGI ##41, 43]

25. In December 2010, the Licursis – on behalf of Spectrum Aluminum – sent CB&T a "hardship letter" and various financial information.  In the letter John wrote: "Our ability to attract work is the only way through which Spectrum Glass and

Aluminum, Inc. will be able to survive this recession and continue paying on our financial responsibilities." [Muse-Fisher, dkt. 27-1, ex. 22, p. 92]

26. In December 2010, the Licursis provided CB&T with an individual financial statement as of Nov. 30, 2010 that claimed they owned an asset of "Investment in Spectrum Glass and Aluminum" of $500,000. It did not reveal Spectrum Mirror. [Appendix, dkt. 29-3, p. 154]  Also, they provided a Spectrum Aluminum balance sheet as of Dec. 31, 2009 that showed the following assets which were later transferred to Spectrum Mirror. There was an identical balance sheet as this one for November 30, 2010: [Appendix, dkt. 29-3, p. 155, 160].

> Glazing materials and supplies - $41,500
>
> Computer - $16,435
>
> Furniture and Fixtures - $29,002
>
> Machinery and Equipment - $58,019

Taking accumulated depreciation into account, the balance sheet showed total fixed assets of $211,466.79, which included a value of $360,543.31 for vehicles with no breakdown or identification of the vehicles referred to.

It is unclear whether the assets (other than the vehicles) were all free and clear of liens, but they appear to be.

27. The appraisal included as assets the computer, the furniture and fixtures and the machinery and equipment and this totaled the $25,715.  On the balance sheet for Nov. 30, 2010 and Dec. 31, 2009, these three categories totaled $103,456.  The appraisal did not include glazing materials and supplies, but some or all of these were transferred to Spectrum Mirror, with a balance sheet value of $41,500.

[*Since Spectrum Aluminum asserts that they were completing some projects, it is*

*possible that they held back some of these materials, but there is no evidence as to this.*] As to the vehicles, CB&T has not claimed a lien and it appears that some or most may have been leased and thus they are not being considered at this time.  Thus the actual value received for the Collateral was substantially less than that presented by the Licursis to CB&T ($144,956 per the balance sheet versus $25,715 which Spectrum Mirror paid).

28. Spectrum Mirror did not investigate to see whether the assets it purchased from Spectrum Aluminum had any liens or encumbrances. [SSGI #68]

29. On July 8, 2010, Spectrum Aluminum's contractor's license was suspended because Spectrum Aluminum had not satisfied a judgment obtained by Vision Builders Group, Inc. LASC # PS012283.  *The Court takes judicial notice that Visions Builders Group filed the lawsuit on December 10, 2009 and obtained a judgment on February 24, 2010 for $143,389.32.*

30. At or about that same time in July 2010, Spectrum Aluminum fired all nine of its employees and Spectrum Mirror hired eight of them. [SSGI ##20, 21, 46] The Licursis did not advise CB&T of the license suspension of Spectrum Aluminum or of the firing of all of its employees.  [SSGI #47]

31. The license suspension did not prevent Spectrum Aluminum from working as a construction manager or owner's representative.  Had it paid off the judgment for which it was suspended, it could have regained its license. [Defendant's Undisputed Facts, dkt. 41, #91]  [*However, there is no showing that Spectrum Aluminum paid off the judgment or that it sought and obtained work as a construction manager or owner's representative.  It probably continued to collect the accounts receivable that it did not transfer to Spectrum Mirror.*]

32. Even after the termination of employees and suspension of the license, through December 2010 Susan continued sending documents to CB&T on behalf of Spectrum Aluminum.  [SSGI #48]

33. In May 2010, Susan filed a Fictitious Business Name Statement that Spectrum Mirror "is doing business as" Spectrum Aluminum and that this commenced on April 15, 2010. [Muse-Fisher, dkt. 27, ex. 20; SSGI #77]

34. In October 2010, John recorded a Fictitious Business Name Statement that he is conducting business under the d/b/a "Spectrum Glass & Mirror." [SSGI #78]

35. SBS Corporation, a general contractor who hired Spectrum Aluminum on numerous projects, continued to hire that company but "may have not been aware that Spectrum Aluminum may have changed its name to Spectrum Mirror." [SSGI #54, Defendants' response]

36. In Fall 2010, John executed a subcontractor agreement with RIC Construction Co., Inc. on behalf of Spectrum Aluminum and another subcontractor agreement with RIC Construction Co,, Inc. on behalf of Spectrum Mirror. [SSGI #51]

37. Although Spectrum Mirror was able to operate on and bid for the same projects as Spectrum Aluminum, it was also positioned to seek other work in the public sector as a woman-owned business. [SSGI #58, Defendants' response]

38. Spectrum Aluminum held both Class B (General Building) and C-17 (Specialty Glass and Glazing) licenses.  Spectrum Mirror only held a C-17 license. [Defendant's Undisputed Facts, dkt. 41, #93]

39. After purchasing the assets of Spectrum Aluminum, Spectrum Mirror used the Spectrum Aluminum name, email address, and website for its own business. [Defendants' Response/Genuine Issues, SSGI #59]

40. The books and records of Spectrum Aluminum and Spectrum Mirror were somewhat confused and the information for each corporation was not separately entered in a way that the accountant could easily unwind. On December 11, 2011, the tax preparer sent an email to Susan stating: "We are trying to unwind and clean up the accounting for each entity and we cannot do it if these pieces are not handled properly. It is up to you, but I suggest respecting each corporate entity separately and not mixing it around. Your lawyer could better advise you. But failing to do so puts you at risk of creditors being able to pierce the corporate veil." [SSGI #67]

41. On October 11, 2013, CB&T filed a complaint against Spectrum Mirror and demanded that Spectrum Mirror deliver its collateral to CB&T. It filed its first amended complaint on March 3, 2015. CB&T alleged that Spectrum Aluminum transferred all of its assets, including CB&T's collateral, to Spectrum Mirror without adequate consideration, and that Spectrum Mirror is simply a continuation of Spectrum Aluminum. [LASC BC524292; SSGI ##72, 83, 84].

42. On June 26, 2015, the Superior Court granted summary judgment in favor of CB&T on the successor liability cause of action. The Superior Court found that the undisputed facts suggest the following:

Spectrum Mirror is the successor or mere continuation of Spectrum Aluminum;

Spectrum Mirror did not pay adequate consideration for Spectrum Aluminum's assets;

Spectrum Aluminum and Spectrum Mirror are owned by John and Susan Licursi;

a majority of Spectrum Aluminum's former employees (8 out of 9) are

employed by Spectrum Mirror;

Spectrum Mirror holds itself out as Spectrum Aluminum;

Spectrum Aluminum held itself out as the owner of the website

www.spectrumglassinc.com and email domain @spectrumglassinc.com

(in 2009-December 2010);

other contractors/vendors believed Spectrum Aluminum and Spectrum

Mirror were the same company;

Spectrum Mirror conducts the same type of business as Spectrum

Aluminum. [LASC BC524292; Muse-Fisher, dkt. 27-2, ex. 24]

43. Thereafter, on August 5, 2015, judgment was entered in favor of CB&T holding

Spectrum Mirror liable for Spectrum Aluminum's judgment entered in 2011.

[LASC BC524292; SSGI ##85-87; Muse-Fisher, dkt. 27-2, ex. 24]


CB&T moves for summary judgment under §§ 523(a)(2)(A) and (B), § 523(a)(4),

and § 523(a)(6).  Specifically and with respect to Section 523(a)(2)(A), CB&T argues

that the following prima facie elements are satisfied:

(a) Debtors continued misrepresentations that Spectrum Aluminum was

doing business despite having been shut down Spectrum Aluminum

and despite the apparent transfer of all of its assets to Spectrum

Mirror.

(b) Debtors knew that Spectrum Aluminum had sold all of its assets to

Spectrum Mirror.

-11-

(c) Debtors' intent to deceive CB&T is clear in that they concealed the transfer from CB&T and provided CB&T with misleading financial statements, all the while never informing CB&T of Spectrum Aluminum's transfer of assets to Spectrum Mirror.

(d) CB&T justifiably relied on Debtors' representations and sustained significant losses including costs in pursuing its claims against Spectrum Aluminum and Spectrum Mirror.

Further, CB&T contends that since it is evident that it justifiably relied on the Debtors' material misrepresentations, CB&T is not only entitled to entry of a nondischargeable judgment under Section 523(a)(2)(A), but also under Section 523(a)(2)(B).

CB&T also argues that the Licursis committed fraud and defalcation while acting in a fiduciary capacity and also committed larceny. Therefore, CB&T asks the Court to enter judgment under Section 523(a)(4). More specifically, as officers of Spectrum Aluminum, Debtors had a duty to protect Spectrum Aluminum's assets. However, they committed a fraud and larceny by transferring its assets to Spectrum Mirror for inadequate consideration and providing CB&T with false information that Spectrum Aluminum was still a viable business.

Finally, CB&T argues that the Licursis are clearly liable under Section 523(a)(6). The Licursis' actions as described above - including intentional misrepresentations, fraud, and larceny - all support a finding that Debtors committed the acts with specific intent to deceive CB&T. As a result, CB&T suffered economic harm.

**Opposition:**

### The Section 523(a)(2)(A) and (a)(2)(B) Claims

The Licursis oppose CB&T's Motion for Summary Judgment ("Motion"). Of primary relevance to their opposition is their contention that the alleged misrepresentations were not made at the time the debt between CB&T's predecessor and Debtors was incurred. This timing issue is crucial as a claim under Section 523(a)(2)(A) will survive where there is evidence that the debtor used fraudulent means to obtain money, property, services, or credit. *Nunnery v. Rountree (In re Rountree),* 478 F.3d 215, 219 (4th Cir. 2007). Here, Debtors assert there is no evidence or allegation, for that matter, that the fraud or misrepresentation was made at the time the loan was entered into, or when Alliance Bank's interest was purchased by CB&T. Rather, CB&T asserts the alleged misrepresentation was made in connection with the undisclosed sale of Spectrum Aluminum's assets to Spectrum Mirror and the period after the sale on or about February 1, 2010. This sale was one year and a half after the initial loan agreement with Alliance Bank and a year after CB&T purchased Alliance Bank's rights to the loan agreement.

Moreover, CB&T cannot demonstrate that the Licursis received any additional money from CB&T based on any representations or omissions with respect to the Spectrum sale. [*See,* Defendants' Opposition, p. 5] Instead, upon Spectrum Aluminum's default, CB&T accelerated the entire unpaid balance on the loan. CB&T then filed a lawsuit against Spectrum Aluminum. Thus, CB&T cannot prove that the Licursis received any benefit from the alleged misrepresentations as there is no evidence of any actual transfer of property or forbearance agreement. [*See,* Opposition, p. 5]

Defendants assert that they reasonably believed that their December 2010 financial estimations concerning Spectrum Aluminum were accurate.  Further, Defendants argue CB&T cannot demonstrate any fraudulent intent on the part of Defendants in their Spectrum sale involvement.  The value paid by Spectrum Mirror to Spectrum Aluminum was fair and was determined by an independent third party.  CB&T was not damaged by this sale.  In fact, it received replacement collateral equal in value to the personal property that was sold.  Thus, CB&T's interest was not harmed.

### The Section 523(a)(4) Claim

Here, CB&T fails to show that a fraud was committed at the time the loan documents were entered into.  Further, CB&T fails to demonstrate that Defendants owed it a fiduciary duty as officers of Spectrum Aluminum.  Defendants rely on *Swimmer v. Moeller (In re Moeller),* 466 B.R. 525, 538 (Bankr. S.D. Cal. 2012) for the proposition that the duty owed to creditors by officers of an insolvent corporation does not support a section 523(a)(4) exception to discharge.  [Opposition, p. 11]

Finally, there are no facts to support a claim of larceny.  Defendants did not wrongfully take CB&T's property.  Moreover, there was no intent to deprive CB&T of its security interest.  In fact, Defendants provided replacement collateral when the Spectrum Aluminum assets were sold.

Since no fiduciary relationship existed between the parties and no larceny was committed, CB&T's Section 523(a)(4) claim cannot stand.

### The Section 523(a)(6) Claim

CB&T fails to show any willful and malicious injury caused by the Licursis in connection with the Spectrum Aluminum sale.  The Licursis have demonstrated that CB&T received replacement collateral equal in value to the property that was sold. CB&T has not provided any evidence to show the replacement collateral was inferior. Moreover, even if the Section 523(a)(6) claim can be upheld, the amount of any potential judgment would be limited to the depreciation of the value of the collateral sold, but not the entire loan amount due.

**Reply:**

CB&T argues that Defendants, in their Opposition, misconstrue Section 523(a)(2).  CB&T asserts that an action under Section 523(a)(2) may stand where the false representations were made in connection with an extension of credit or forbearance of credit.   Just because there are no allegations of misrepresentations at the time of the origination of the loan does not mean a Section 523(a)(2) claim will fail. CB&T asserts that Defendants provided false information in writing (i.e. financial statements claiming Spectrum Aluminum assets were valued at $326,020.65 and had a going concern value of $500,000) in an effort to keep CB&T from enforcing its rights against Spectrum Aluminum for the breach of the loan agreement.  As a result, CB&T did not proceed expeditiously with a foreclosure sale of the business or seek appointment of a receiver following the initial default in June 2009.

Further, CB&T disputes Defendants' proposition that they did not intend to deceive CB&T.  Intent can be proven from the circumstances of this case.  For instance, CB&T asserts there was a side agreement between Spectrum Aluminum and Spectrum

Mirror whereby Spectrum Mirror would pay the purchase price of the assets by paying off Spectrum Aluminum's trade creditors and that this agreement should have been a part of the original Asset Purchase Agreement.  Further fraudulent intent can be shown by the fact that Susan Licursi signed the Asset Purchase Agreement using her maiden name of Susan Marshall.  However, the Statements of Information submitted to the California Secretary of State indicate Susan Licursi was the CEO and director of Spectrum Mirror.  Thus, based on the above, CB&T argues it is entitled to a nondischargeable judgment under Section 523(a)(2)(A) and (B).

With respect to its Section 523(a)(4) claim, Plaintiff disputes the Licursis' argument that there is no fiduciary relationship between the Licursis and the Plaintiff. The Licursis, as officers of Spectrum Aluminum, owed a fiduciary duty to CB&T. Moreover, the statute does not limit the relief to the origination of the loan.  Therefore, when Defendants provided CB&T with the false financial information, when Defendants sold Spectrum Aluminum's assets to Spectrum Mirror at a forced auction value, and when Defendants paid Spectrum Aluminum's trade creditors over other creditors, Defendants breached their fiduciary duty to CB&T.

Beyond that, Defendants committed a larceny by selling the assets to Spectrum Mirror.  CB&T had a blanket security interest over these assets, therefore Defendants unlawfully converted these assets.  As such, CB&T is entitled to a nondischargeable judgment under Section 523(a)(4).

With respect to its Section 523(a)(6) claim, CB&T relies on *Nahman v. Jacks (In re Jacks),* 266 B.R. 728 (2001 Bankr. LEXIS 1205) for the proposition that a transfer of collateral in breach of a security agreement is actionable under Section 523(a)(6). Defendants knew what they were doing when they sold Spectrum Aluminum's assets to

Spectrum Mirror and knew it would cause harm to CB&T.  Therefore, CB&T is entitled to a nondischargeable judgment under Section 523(a)(6).

**Analysis:**

### Standard for Summary Judgment

Summary judgment is proper when the pleading, discovery, and affidavits show that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the proceedings.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  The facts must be viewed in the light most favorable to the party opposing the motion.  *Anderson*, 477 U.S. at 249; *Masson v. New Yorker Magazine,* 501 U.S. 496, 520 (1991).  Mere allegations or denials do not defeat a moving party's allegations.  *See Gasaway v. Northwestern Mut. Life Ins. Co*., 26 F.3d 957, 960 (9th Cir. 1994).

**Section 523(a)(2)(A)**

11 U.S.C. §523(a)(2)(A) provides:

A discharge under section 727 . . . of this title does not discharge an individual
debtor from any debt  . . . for money, property, services, or an extension,
renewal, or refinancing of credit, to the extent obtained by—false pretenses, a
false representation, or actual fraud, other than a statement respecting the
debtor's or an insider's financial condition . . . .

The required elements under §523(a)(2)(A) consist of the following: (1) the
defendant made false representations; (2) the defendant knew the representations were
false at the time made; (3) the defendant intended to deceive the plaintiff; (4) the plaintiff
justifiably relied on the representations; and (5) the plaintiff sustained damages as a
proximate result of these representations. *See, e.g., Turtle Rock Meadows
Homeowners Ass'n v. Slyman (In re Slyman),* 234 F.3d 1081, 1085 (9th Cir. 2000);
*American Express Travel Related Servs. Co. v. Hashemi (In re Hashemi)*, 104 F.3d
1122, 1125-26 (9th Cir. Cal. 1996); *In re Younie*, 211 B.R. 367, 373–74 (B.A.P. 9th Cir.
1997), *aff'd* 163 F.3d 609 (9th Cir. 1998) (noting that the elements of fraud under §
523(a)(2)(A) match the elements of common law fraud under California law). The
Plaintiffs must prove each element by a preponderance of the evidence.  *Grogan v.
Garner*, 498 U.S. 279 (1991).

Intent to deceive may be inferred from the totality of the circumstances.  *See,
e.g., Hashemi,* 104 F.3d at 1125.

Section 523(a)(2)(A) renders nondischargeable a debt for money "to the extent
obtained by" misrepresentation, fraudulent omission, or deceptive conduct.  The
operative phrase here is "to the extent obtained by."  This certainly applies when the
prescribed conduct occurred before the debtor receives the money.  *Hopper v. Lewis (In
re Lewis),* 551 B.R. 41, 48 (Bankr. E.D. Cal. 2016).  But it also applies if the action of

the creditor is to forebear in its collection of the debt.  This, too, can be seen as an

extension of credit.  *Field v. Mans*, 157 F.3d 35 (1st Cir. 1998)

The Court finds these facts are undisputed:[2]  Alliance Bank and Spectrum

Aluminum entered into a business loan in September 2008 ("Loan Agreement"); CB&T

acquired the assets of Alliance from the FDIC in February 2009; Spectrum Aluminum

breached the Loan Agreement in June 2009; and CB&T made demand on Spectrum

Aluminum to cure the defaults under the Loan Agreement.  Thus, it is absolutely clear

that a debt was incurred by the Defendants, it was owed to Alliance, and then

subsequently owed to CB&T.  But there is no contention that the original loan from

Alliance was obtained by Defendants via alleged misrepresentations.

In its adversary complaint, Plaintiff asserts a claim under Section 523(a)(2)(A) by

contending "Debtors knowingly made false representations to Plaintiff in connection with

the workout of the underlying Spectrum Aluminum Loan…"  [Complaint, p. 9, par. 52]

Plaintiff further states in its Motion that "Defendants made several misrepresentations to

CB&T in connection with their undisclosed sale of Spectrum Aluminum's assets to

Spectrum Mirror and the ensuing period after such sale where the Defendants

repeatedly represented that Spectrum Aluminum was conducting business

notwithstanding that it had been shut down."  [Motion, p. 14]

Defendants, on the other hand, argue that CB&T's allegations cannot uphold a

claim under Section 523(a)(2)(A) because the alleged misrepresentations arose after

the debt was already incurred.  As noted by the *Hopper* court, "prescribed conduct that

occurs after the debtor obtains money does not count and will not support a

nondischargeability claim under Section 523(a)(2)(A)."  *Id.;* citing *Houng v. Tatung, Co.,*

---

[2] The Undisputed Facts found by the Court are laid out above.

*Ltd. (In re Houng),* 499 B.R. 751, 766 (Bankr. C.D. Cal. 2013).

The Court must look to the text of Section 523(a)(2)(A) as the starting point for analysis and for the basis of this decision.  *Field v. Mans,* 157 F.3d 35, 43 (1st Cir. 1998); *citing Shawmut Bank, N.A. v. Goodrich (In re Goodrich),* 999 F.2d 22, 24 (1st Cir. 1993).  In *Mans,* the First Circuit looked at the meaning of the word "extension" in Section 523(a)(2)(A).  The First Circuit found that the word "extension" has at least two meanings.  The meaning that the First Circuit found acceptable and relevant to the *Mans* case is a meaning this Court finds relevant to the instant case.  The First Circuit noted that an extension may be an "increase in length of time" or "an agreement on or concession of additional time (as for meeting an overdue debt or fulfilling a legal formality)."  *Id.*

Here the Court finds that Defendants failed to (1) inform CB&T of the Asset Purchase Agreement between Spectrum Aluminum and Spectrum Mirror in February 2010; (2) inform CB&T of the transfer of the Spectrum Aluminum assets to Spectrum Mirror in April 2010; and (3) inform CB&T that Spectrum Aluminum was no longer operating in July 2010.  This caused CB&T to delay exercising its rights under the Loan Agreement.  This constitutes an extension of credit since - but for Defendants' failure to fully disclose and their misrepresentations - CB&T could have withdrawn the credit previously extended, terminated the agreement and may also have sought recourse from Spectrum Mirror sooner rather than waiting until October 2013.  Beyond that, CB&T could have demanded that the $25,000+ paid by Spectrum Mirror be paid to CB&T rather than to the unsecured creditors of Spectrum Aluminum, thus reducing the outstanding balance on its loan.  It might also have challenged the appraisal and received even more from Spectrum Mirror or required that Spectrum Mirror enter into a

security agreement with CB&T.  All of these avenues of recovery were denied to CB&T

due to the misrepresentations and lack of notice by Defendants.  *See Mans,* 157 F.3d at

24 ("the fraudulently concealed sale did not alter the existing terms of credit, assuming

the loan was not called.  Instead, it undermined the Fields' right to have forthwith

terminated that credit- because of the unpermitted sale- had they wished to do so…

While the existing sale was not technically a new 'agreement' concerning the existing

credit, it triggered legal rights under the existing credit agreement which markedly

altered the credit relationship between the parties.  We, therefore, agree with the Fields

that, by deceiving them into continuing a credit arrangement they now had the right to

terminate, the fraud related to what can properly be called an extension of credit.")

  Thus, based on the above, the following required elements for liability under

Section 523(a)(2)(A) have been established.  The circumstances demonstrate that (1)

the Licursis made material false representations by failing to disclose the sale of the

assets of Spectrum Aluminum to Spectrum Mirror, as well as by failing to disclose

Spectrum Aluminum's close of business, Spectrum Aluminum's bankruptcy, and their

misrepresentations in the December 2010 financial statements; (2)  the Licursis were

aware of the false representations evident since John Licursi is both an officer and

director of both Spectrum Aluminum and Spectrum Mirror and Susan Licursi is

intimately involved in the running of Spectrum Aluminum and an officer and director of

Spectrum Mirror; (3) the Licursis' intent to deceive is evident since they facilitated the

transfer of the assets and took an active role in the creation and set-up of Spectrum

Mirror; and (4)  CB&T's justifiable reliance is reasonable since it had no knowledge of

the transfer of assets or of the Licursis' continued actions concerning both Spectrum

Aluminum and Spectrum Mirror.

The issue of damages suffered by CB&T is discussed separately below.

## Section 523(a)(2)(B)

11 U.S.C. §523(a)(2)(B) provides:

A discharge under section 727… of this title does not discharge an individual debtor from any debt… for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by …use of a statement in writing-(i) that is materially false; (ii)respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive.

The elements of Section 523(a)(2)(B) are the same as Section 523(a)(2)(A) with the additional requirement that the alleged fraud stem from a false statement in writing concerning the debtor's or an insider's financial condition. *Bacino v. FDIC (In re Bacino),* 2015 Bankr. LEXIS 4398, *48 (9th Cir. BAP December 31, 2015); *citing Gertsch v. Johnson & Johnson (In re Gertsch),* 237 B.R. 160, 167 (9th Cir. BAP 1999).

As with the Section 523(a)(2)(A) claim, Plaintiff contends that the Licursis materially misrepresented Spectrum Aluminum's financial condition in connection with the work out of the Spectrum Aluminum loan. [Motion, p. 17]  The evidence shows that in December 2010 Defendants sent a letter to CB&T to which they attached an individual financial statement that valued their current investment in "Spectrum Glass & Aluminum" at $500,000. [Appendix, dkt. 29-3, p. 154]  This was clearly misleading and led CB&T to believe that Spectrum Aluminum was still an operating company with a going concern value in that amount.

As to the timing (as discussed above concerning §523(a)(2)(A), Plaintiff contends that since this was done as part of Defendants' attempt at achieving a work out of the Spectrum Aluminum loan, this induced its reliance and forced CB&T to delay any

exercise of its rights under the Spectrum Aluminum loan.  Defendants argue that no money or forbearance agreement was obtained from CB&T in response to this 2010 letter.  Further, any alleged misrepresentation described by CB&T occurred over one and a half years after the initial debt was incurred.  Thus, Defendants argue that a Section 523(a)(2)(B) claim cannot stand.

The Court finds that the § 523(a)(2)(B) claim rides on the same occurrences as the action under §523(a)(2)(A) but for the fact that there is an actual writing respecting the financial condition of the Debtor or of the insider of the Debtor:  the December 2010 financial statements.

The Tenth Circuit has previously examined the meaning of the term "financial condition":

> We hold that such false statements are those that purport to present a picture of the debtor's overall financial health. Statements that present a picture of a debtor's overall financial health include those analogous to balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities. However, such statements need not carry the formality of a balance sheet, income statement, statement of changes in financial position, or income and debt statement. What is important is not the formality of the statement, but the information contained within it-- information as to the debtor's or insider's overall net worth or overall income flow.

*Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 714 (10th Cir. Wyo. Oct. 24, 2005); *Adopted by Barnes v. Belice (In re Belice),* 461 B.R. 564, 578 (9th Cir. BAP 2011).  As the BAP noted, "in other words, the writing must be a complete or comprehensive statement, regarding a debtor's income and expenses."  *Id.*

Here, the Licursis submitted various documents to CB&T on or about December 17, 2010.  The documents include the following:  (1)  a letter dated December 17, 2010

from John M. Licursi as President of Spectrum Aluminum, which seeks to explain the

company's "hardship situation;" (2) a letter dated December 17, 2010 from John and

Susan Licursi which attaches various financial documents "in an effort to expedite the

review of the all-cash offer we received on our building;" (3)  purchase contract for the

building; (4) Debtors' individual financial statement including assets and liabilities as of

November 30, 2010, which shows Debtors' investment in Spectrum Aluminum to be

$500,000; (5) Spectrum Aluminum's balance sheet including assets and liabilities as of

December 31, 2009; (6) Spectrum Aluminum's 2009 Profit and Loss statement; (7)

Spectrum Aluminum's balance sheet including assets and liabilities as of November 30,

2010; (8)  Spectrum Aluminum's 2010 Profit and Loss statement; (9)  Spectrum

Aluminum's 2009 tax return; and (10) Debtors' 2009 tax return.

The Court finds these documents reference an overall picture of the Debtors'

financial health, as well as the Debtors' company's financial health.  The documents

refer to both income and expenses, as well as assets and liabilities.  There is no

question that these documents are comprehensive in nature.  Further, these documents

show that Spectrum Aluminum continued to do business and continued to hold CB&T's

collateral, per the Loan Agreement.  There is no reference in this package of documents

to Spectrum Mirror or to the Asset Purchase Agreement between Spectrum Aluminum

and Spectrum Mirror, which had been entered into some ten months earlier and

consummated over 6 months earlier.  The Court finds CB&T did in fact delay in

exercising its rights under the loan agreement based on these written representations

from Debtors.

The insider of a corporate debtor is defined as a director or officer or person in

control of the debtor or a relative of a director, officer, or person in control of the debtor.

11 USC §101(31)(B).  The Court has not been given evidence of Susan's actual status in Spectrum Aluminum, but it is clear that John is an officer and that Susan is his wife. Thus the December 2010 financial statements and her letters to CB&T impose liability on Susan as well as John.

Therefore, for purposes of liability, the requisite writing element of Section 523(a)(2)(B) is present in this case, as are the remaining elements of Section 523(a)(2)(B) as discussed above under Section 523(a)(2)(A).

## Section 523(a)(4)

11 U.S.C. § 523(a)(4) provides:

A discharge under section 727… of this title does not discharge an individual debtor from any debt…for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

A creditor must establish three elements to render a claim nondischargeable under section 523(a)(4):  (1) express (or technical) trust; (2) that the debt was caused by fraud or defalcation; and (3) that the debtor was a fiduciary to the creditor at the time the debt was created.  *Swimmer v. Moeller (In re Moeller),* 466 B.R. 525, 531 (Bankr. S.D. Cal. 2012); citing  *Otto v. Niles (In re Niles),* 106 F.3d 1456, 1459 (9th Cir. 1997); *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996).  Whether someone is a fiduciary for purposes of Section 523(a)(4) is a question of federal law.  *Houng v. Tatung Company (In re Houng),* 636 Fed. Appx. 396, 398 (9th Cir. 2016).  Further, although the definition of fiduciary is a matter of federal law, state law is to be consulted to determine when a trust in this strict sense exists.  *Houng,* 636 Fed. Appx. at 398.

Plaintiff argues that the debt incurred was based on Defendants' fraud and defalcation while acting in a fiduciary capacity.  Plaintiff also asserts that Defendants are

liable for larceny.  Plaintiff relies on *In re Jacks* to demonstrate that its claim firmly falls under Section 523(a)(4) as a fiduciary relationship was established between Defendants and Plaintiff because Defendants were officers of an insolvent corporation, Spectrum Aluminum.  *Nahman v. Jacks (In re Jacks),* 266 B.R. 728 (9th Cir. BAP 2001).

On the other hand, Defendants contend there are no facts substantiating a fiduciary relationship or act of defalcation.  Moreover, Defendants argue Plaintiff's reliance on *In re Jacks* is misplaced and no longer appropriate.  Defendants point to the case of *Cal-Micro, Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1127 (9th Cir. 2003) for the proposition that a corporate officer is only an agent and not a fiduciary within the meaning of Section 523(a)(4).  [Opposition, p. 11]

To begin with, the Court is lacking evidence of the status of Susan as either a corporate officer or director (or both) of Spectrum Aluminum.  The Court has not been given any corporate documents or filings identifying her as such.  The Spectrum Aluminum bankruptcy petition was signed solely by John as president.  Therefore, without such evidence, the Court cannot hold Susan liable for breach of fiduciary duty.[3]

There is a dispute amongst the parties as to whether John Licursi, as president of Spectrum Aluminum, acted in a fiduciary capacity as is applicable in the dischargeability context.  This legal argument is based on the following decisions:

*Jacks*, a Ninth Circuit B.A.P. decision from 2001, concerned a creditor of an insolvent corporation of which Jacks was an officer and director.  Jacks was found to have used corporate assets for his own personal benefit.  Determining whether an officer or director of an insolvent corporation is liable as a fiduciary under §523(a)(4),

---

[3] Although there is no evidence of liability of Susan Licursi unless it is shown that she was an officer or director of Spectrum Aluminum, the Court speaks of Debtors and Defendants in the plural since once that evidence is presented, Susan will also be subject to liability.

the B.A.P. held:

> Section 523(a)(4) requires an express or technical trust in existence before and independently of the defalcation. *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996) (citing *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986)). A trust arising as a consequence of wrongdoing, such as a constructive, resulting, or implied trust, is outside the purview of § 523(a)(4). *Evans v. Pollard (In re Evans)*, 161 B.R. 474, 477 (9th Cir. BAP 1993). Whether a fiduciary is the trustee of an express trust depends on state law, and an express trust may be imposed by common law. *Lewis*, 97 F.3d at 1185-86 (holding that Arizona case law imposes express trust on partners).

> California courts have recognized that "all of the assets of a corporation, immediately on its becoming insolvent, become a trust fund for the benefit of all of its creditors." *Saracco Tank & Welding Co., Ltd. v. Platz*, 65 Cal. App. 2d 306, 315, 150 P.2d 918, 923 (1944) (citation omitted). See also *Pepper*, 308 U.S. at 307.

> Here, the bankruptcy court rejected the notion that Jacks had any relevant common law fiduciary duties to Nahman and other creditors, concluding that Cal. Corp. Code §§ 166, 500, and 501 (prohibiting unauthorized distributions by directors) "covers the field" of these duties. *Jacks*, 243 B.R. at 392-393. This is consistent with some recent commentary and case law, which cast doubt on whether the California trust fund doctrine continues to provide a basis for the technical trust necessary for § 523(a)(4) nondischargeability. See generally 15A William Meade Fletcher et. al., Fletcher Cyclopedia of the Law of Private Corporations § 7373 (perm. ed., rev. vol. 2000); see also *Pacific Scene, Inc. v. Penasquitos, Inc.*, 46 Cal. 3d 407, 250 Cal. Rptr. 651, 758 P.2d 1182 (1988). In Pacific Scene, the California Supreme Court held that, by codifying "detailed statutory remedies" against shareholders of dissolved corporations (Cal. Corp. Code §§ 2009 and 2011), the California legislature had "occupied the field and precluded resort to dormant common law doctrines for the provision of extra-statutory relief." *Id*. at 413, 250 Cal. Rptr. at 655, 758 P.2d at 1185. See also *United States v. Oil Resources, Inc.*, 817 F.2d 1429, 1432-33 (9th Cir. 1987).

> Nevertheless, the bankruptcy court concluded that the fiduciary relationship between an insolvent corporation's officers and directors and its creditors was a "sufficient trust relationship for the application of § 523(a)(4)." *Jacks*, 243 B.R. at 394 (citing *Berres v. Bruning (In re Bruning)*, 143 B.R. 253 (D. Colo. 1992) (applying Colorado law); *Committee v. Haverty (In re Xonics, Inc.)*, 99 B.R. 870 (Bankr. N.D. Ill. 1989) (applying Delaware law); and *Bay 511 Corp. v. Thorsen (In re Thorsen & Co.)*, 98 B.R. 527 (Bankr. D. Colo. 1989) (applying Colorado law)).

> We read this apparent discontinuity in the bankruptcy court's opinion as recognizing that California's Corporation Code provides a remedy for an insolvent corporation's director's violations of fiduciary duties to creditors. This is consistent with the notion that "the common law is not repealed by implication or otherwise, if there is no repugnancy between it and the statute, and it does not appear that the legislature intended to cover the whole subject." *Gray v. Sutherland*, 124 Cal. App. 2d 280, 290, 268 P.2d 754, 761 (1954) (citation omitted). California's corporate statutes, while modifying remedies, do not eliminate the trust

comprised of corporate assets that arises upon a corporation's insolvency.

We agree with the bankruptcy court, and note that this Panel has held that Oregon's parallel "trust fund doctrine" imposes an express trust sufficient for the application of § 523(a)(4). *Flegel v. Burt & Associates, P.C. (In re Kallmeyer)*, 242 B.R. 492, 496 (9th Cir. BAP 1999).

*Jacks*, 266 B.R. 728, 736-737.

Two years later, in 2003, the Ninth Circuit ruled that under California law [as it then existed] a corporate officer is not a fiduciary to the corporation or its shareholders for purposes of §523(a)(4).  Rather the relationship is one of agency rather than of trust. *Cal-Micro, Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119 (9th Cir. 2003).  *Cantrell* did not deal with the holding of *Jacks* since the plaintiff was the corporation itself and not a creditor of the corporation.  The court found that under California law, although Cantrell was in a fiduciary relationship to the corporation, he was not a trustee, but was an agent with certain duties of a trustee.  However, he was not a trustee with respect to corporate assets.  Nor was this corporation insolvent, so that was never discussed.

In 2009, the California Court of Appeal ruled on the fiduciary duty that a corporate officer or director has to creditors when a corporation is insolvent.  It held that under these circumstances, the "trust fund doctrine" creates a duty on directors and officers to the creditors only if they divert, dissipate, or unduly risk the insolvent corporation's assets.  *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020, 1039, et. seq (Cal. Ct. of App. 6th App. Dist. 2009).

Thereafter, Judge Laura Taylor in the Southern District of California Bankruptcy Court, came down with a strong analysis of the effect of *Berg* and *Cantrell* on the *Jacks* opinion.  She ruled that under California law as explicated by *Berg*, the "trust fund doctrine" does not give rise to the express or technical trust relationship required by

§523(a)(4).  *Swimmer v. Moeller (In re Moeller)*, 466 B.R. 525 (Bankr. SD Cal. 2012).

In 2013, Judge Margaret Morrow of the Central District of California District Court issued an opinion critical of *Moeller* and leading to the exact opposite result.  *Jacks* was to be followed and *Berg* had not changed this.  *Yin-Ching Houng v. Tatung Co. (In re Yin-Ching Houng)*, 499 B.R. 751 (Dist. CD Cal. 2013).  Judge Morrow was affirmed by the Ninth Circuit, which found that

> the duties created by the trust fund doctrine satisfy the criteria for a "fiduciary" relationship for purposes of nondischargeability under § 523(a)(4). The trust fund doctrine "clearly and expressly impose[s] trust-like obligations" on the controllers of an insolvent entity. 4 Collier on Bankruptcy, ¶ 523.10. Because the duties arise at insolvency, see *Berg*, 100 Cal. Rptr. 3d at 893, and require the avoidance of "divert[ing], dissipat[ing], or unduly risk[ing] corporate assets," id. at 894, the fiduciary relationship exists "prior to any wrongdoing" and "without reference to [the wrong]," as required by § 523(a)(4). *Ragsdale*, 780 F.2d at 796. This is in contrast to a trust "ex maleficio," i.e., a trust that arises "by operation of law upon a wrongful act," that we have held is outside of § 523(a)(4)'s purview. *Blyler v. Hemmeter (In re Hemmeter)*, 242 F.3d 1186, 1189-90 (9th Cir. 2001)….Here, because California's common law trust fund doctrine imposes "true fiduciary responsibilities" prior to "the act of wrongdoing and not as a result of the act of wrongdoing," *In re Pedrazzini*, 644 F.2d at 758, 758 n.2, the "express or technical" trust requirement for nondischargeability is satisfied.

*Yin-Ching Houng*,  636 Fed. Appx. 396, 399-400.

*Yin-Ching Houng* is the current state of the law and the Court will abide by that ruling.

Thus, if the Court finds that Spectrum Aluminum was insolvent during the relevant period, then a fiduciary relationship existed between John Licursi, as an officer of Spectrum Aluminum, and CB&T, a creditor of Spectrum Aluminum, because the insolvency of a corporation creates an express trust under California's trust fund doctrine.   The burden is on CB&T to convince the Court that Spectrum Aluminum was insolvent at the requisite time for the fiduciary requirement under Section 523(a)(4) to be established.

At the March 28, 2017 hearing, CB&T argued that there is sufficient evidence to demonstrate Spectrum Aluminum's insolvency from June 2009 through the end of 2010. CB&T contends this is the operative time frame in regards to insolvency since June 2009 is when Spectrum Aluminum initially defaulted on the loan.  Thereafter, in February 2010, Spectrum Mirror bought Spectrum Aluminum's assets without any disclosure of this sale to CB&T.  Finally, Spectrum Aluminum filed bankruptcy in December 2010.

On the other hand, Debtors argue that the operative time frame is between February 2010 and April 2010.  This is when the transfer of the assets of Spectrum Aluminum to Spectrum Mirror occurred.  Debtors assert that the evidence presented by CB&T fails to support insolvency during this time period.

The Court finds that CB&T has presented sufficient evidence to demonstrate insolvency from December 31, 2009 through the end of 2010.  As CB&T correctly points out, from a balance sheet standpoint, Spectrum Aluminum's liabilities clearly exceeded assets in both 2009 and 2010.  In 2009, Spectrum Aluminum's assets amounted to $879,719.58 and liabilities amounted to $1,559,445.58.  In 2010, Spectrum Aluminum's assets amounted to $328,020.65 and liabilities totaled $1,487,075.23.  Moreover, the attached 2009 tax returns show Spectrum Aluminum operated at a loss during that time. [*See, Muse-Fisher,* dkt. 27-1, Ex. 22]  Finally, CB&T provides a December 17, 2010 letter from John to CB&T specifically referenced as "hardship letter."  In this "hardship letter," Debtor explains Spectrum Aluminum became delinquent on the account and has been unable to become current due to the economic downturn.  [*See, Toal,* dkt.28, Ex. 13.]  This letter attaches various financial documents including balance sheets and tax returns.

When a corporation becomes insolvent, California's trust fund doctrine imposes

an additional, albeit limited, fiduciary duty on the corporation's directors. *Houng*, 636

Fed. Appx. 399-400.  The insolvency of a corporation creates an express trust under

California's trust fund doctrine.  Therefore, in this case, Spectrum Aluminum's

insolvency gave rise to an express trust for the benefit of its creditors, including CB&T

This took place before the APA was entered into in February 2010 and the actual

transfer, which took place in April 2010.  Thus the Court finds that Spectrum Aluminum's

insolvency predated the APA and the transfer of assets and that the officers and

directors of Spectrum Aluminum were fiduciaries to CB&T and to the other creditors of

Spectrum Aluminum prior to the wrongdoing

The evidence has established (1) the requisite trust exists, (2) Spectrum

Aluminum was insolvent during the required period, and (3) a fiduciary duty, therefore,

was owed by Spectrum Aluminum's officers and directors to CB&T under Section

523(a)(4).  However, before the Court can find that all of the elements of a Section

523(a)(4) claim exist, CB&T must demonstrate that a fraud or defalcation occurred.

Essentially, CB&T argues that Defendants failed to advise CB&T of the sale of

Spectrum Aluminum's assets to Spectrum Mirror in February 2010.  The alleged

fraudulent misrepresentations of Defendants in connection with this sale of assets leads

to Defendants' liability for depleting assets that were part of CB&T's security interest.

Defendants, on the other hand, argue that there was no fraud involved with

respect to the sale of the Collateral to Spectrum Mirror.  In their Opposition, Defendants

assert the assets were transferred only after an independent third party valuation was

obtained for the transferred assets.  Also, Defendants argue CB&T received

replacement collateral in the form of the money paid by Spectrum Mirror [referring to

Defendant's response to SSIG #61, in which they state that "Defendants were not

aware that they had to identify the transfer to CB&T as value was exchanged for value

and the security interest of CB&T applied to the replacement asset.  Spectrum Mirror

did not convert CB&T's property interest as the value of the equipment sold was

replaced by the value of the purchase price paid.  The value received by Spectrum

Aluminum was subject to CB&T's security interest."]

Further, at the hearing, Defendants asserted that the sale of the assets occurred

as a result of the lawsuit Spectrum Aluminum was facing.  The creation of Spectrum

Mirror and the sale of the assets to Spectrum Mirror were Defendants' attempts at

salvaging some of Spectrum Aluminum's business.

While Defendants' may have been attempting to save their business, they did

this at the expense of CB&T.  It is clear that Defendants' transfer of the assets to

Spectrum Mirror from Spectrum Aluminum was Defendants way of keeping the assets

free from any potential future judgment against Spectrum Aluminum.  Further, the use of

the assets to pay off other creditors to the detriment of CB&T was a breach of their duty

to the secured creditor.

Although the Court has already found fraud under section 523(a)(2), defalcation

also exists in this case.  Defalcation involves either bad faith, moral turpitude, or other

immoral conduct or it requires an intentional wrong.  The fiduciary must know that it is

improper or it can be so reckless that it is due to a conscious disregard or willful

blindness to a substantial and unjustifiable risk that the conduct will turn out to violate a

fiduciary duty. *Bullock v. BankChampaign, N.A*., 185 L. Ed. 2d 922, 928 (U.S. May 13,

2013)

The Court finds that there is no triable issue of fact as to the bad faith of the sale

of the assets without paying CB&T and without CB&T's knowledge.  This meets the test

of defalcation.  The argument that CB&T received a replacement lien is totally without

merit as the money was immediately disbursed to others and CB&T's lien disappeared.

Therefore, the Court finds that there is no triable issue of fact as to whether or

not John Licursi is liable for fraud and for defalcation.  The Court finds that Plaintiff is

entitled to summary judgment on this claim as to John Licursi.

### Section 523(a)(6)

11 U.S.C. § 523(a)(6) provides:

A discharge under section 727… of this title does not discharge an individual
debtor from any debt- (6) for willful and malicious injury by the debtor to another
entity or to the property of another entity.

Nondischargeability under § 523(a)(6) requires that an injury to the plaintiff be

both willful and malicious, with the requirement of each to be considered separately.

*Carrillo v. Su (In re Su),* 290 F.3d 1140, 1146 (9th Cir. 2002).  Both willfulness and

maliciousness must be proven to block discharge under Section 523(a)(6).  *Lewis,* 551

B.R. at 51; (citing *Kawaauhau v. Geiger,* 523 U.S. 57, 61-62 (1998)).  The plaintiff must

establish the elements of each requirement by a preponderance of the evidence.

*Lewis,* 551 B.R. at 51.

The four elements are as follows:

1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is

done without just cause or excuse.  *Ormsby v. First Am. Title Co. (In re Ormsby),* 591

F.3d 1199, 1207 (9th Cir. 2010), citing *Petralia v. Jercich (In re Jercich),* 238 F.3d 1202,

1209 (9th Cir. 2001) (quoting *In re Bammer,* 131 F.3d at 791).  The main difference is

the standard used by the Court – objective or subjective.

### 1. Malicious Injury

> A "willful" injury is a "deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998) (emphasis in original). "A 'malicious' injury involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" *In re Su*, 290 F.3d at 1146-47 (quoting *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1209 (9th Cir. 2001)).

*Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702, 706 (9th Cir. 2008).

> This four-part definition does not require a showing of biblical malice, i.e., personal hatred, spite, or ill-will. *Id.* at 1442-43. Nor does it require a showing of an intent to injure, but rather it requires only an intentional act which causes injury.

*Murray v. Bammer (In re Bammer),* 131 F.3d 788, 791 (9th Cir. 1997) citing *In re Cecchini*, 780 F.2d 1440, 1442-3 (9th Cir. 1986).

Thus, the intent required in the "maliciousness" prong is the intent to do the act at issue, not the intent to injure the victim.

The undisputed facts show that the Defendants executed an Asset Purchase Agreement between Spectrum Aluminum and Spectrum Mirror; that this transfer caused Spectrum Mirror to pay some of Spectrum Aluminum's obligations but not those owed to CB&T; that Defendants provided CB&T with financial statements in December 2010 on behalf of Spectrum Aluminum that failed to disclose the asset transfer to Spectrum Mirror which had taken place over six months earlier; and that CB&T was unaware of the asset transfer until approximately September 2012.

Although CB&T filed suit against Spectrum Aluminum in May 2010, there were no significant assets remaining and the collateral had already been transferred the

previous month.  CB&T was delayed in filing a complaint against Spectrum Mirror until

2013.  Based on the facts, the Court determines Defendants' acts were wrongful in that

they misused CB&T's collateral without its permission and caused CB&T to delay

seeking a judgment against Spectrum Mirror.

Moreover, the transfer of the assets without disclosing the information to CB&T

shows Defendants acted intentionally in an effort to prevent CB&T from seeking

collection on the obligation while they were able to continue to operate – now under the

name of Spectrum Mirror.  It can also be inferred that the only reason that the money

received from Spectrum Mirror for the Spectrum Aluminum assets was used to pay

unsecured creditors of Spectrum Aluminum was so that those trade creditors would

continue to do business with the Licursis operating as Spectrum Mirror.

These wrongful acts necessarily caused injury to CB&T because its collateral

was dissipated, Spectrum Aluminum failed to function and Spectrum Mirror took over

the business that Spectrum Aluminum had previously conducted.

Although the Debtors seek to explain this so as to demonstrate a just cause or

excuse, none exists.

The undisputed facts further demonstrate that Defendants' transfer of the assets,

as well as Defendants' failure to disclose the transfer of the assets, necessarily caused

injury to CB&T.  Here, it is undisputed that CB&T learned of the transfer in September

2012 [SSGI #70].  Thus, there was a period of over two years whereby CB&T did not

pursue legal remedies against Spectrum Mirror, did not have possession of its

collateral, and did not receive any payments on its claim.  Defendants' acts undoubtedly

caused injury to CB&T.

Finally, Plaintiff must demonstrate the acts were done without just cause or

excuse.  In their Opposition, Defendants explain:

> the intent behind the Spectrum Sale was to salvage business
> operations by the sale of certain assets to Spectrum Mirror which in
> turn assumed certain obligations in connection with those assets
> and relieved Spectrum Aluminum of those liabilities.  The purpose
> was not to deprive CB&T of its security interest or the collateral.

At best, Defendants could argue that the sale was an attempt to make money in the new business - Spectrum Mirror - in order to repay the loan.  However, Defendants have not provided evidence to support this conclusion.  The Court finds that there is no just cause or excuse for Defendants' failure to notify CB&T of the transfer of assets and no just cause or excuse for the written misrepresentations in their December 2010 letters and financial statements.  Had they intended to continue CB&T's secured interest, they would either have paid the proceeds to CB&T or given CB&T a lien on the assets of Spectrum Mirror.  They did neither, nor did they make any payments to CB&T once Spectrum Mirror was operating.

The Court finds that these acts were done to deceive Plaintiff so that Plaintiff would not pursue an action against Spectrum Aluminum or collect, should a judgment against Spectrum Aluminum be entered.  Therefore, the Court finds that there are no genuine issues of material fact and finds that the Defendants acted maliciously.

## 2.  Willfulness

An injury is "willful" when it is shown that either the debtor had a subjective motive to inflict injury or that the debtor believed that injury was substantially certain to occur as a result of his conduct.  *Jercich,* 238 F.3d at 1208.

In its Motion, Plaintiff argues that Defendants formed Spectrum Mirror to acquire

the assets of Spectrum Aluminum in order to avoid the consequences of CB&T's lien in such assets and its enforcement rights and remedies against those assets. [*See,* Motion, p. 20.]  The Defendants not only failed to provide notice to CB&T of the transfer of assets, but also misrepresented to CB&T that Spectrum Aluminum was still a going concern.  [Motion, p. 20.]

Defendants contend that this was not a wrongful act that would necessarily cause injury since the CB&T lien transferred to the proceeds of the sale (the replacement collateral) and, as such, CB&T's security interest was not extinguished by virtue of the transfer.  [*See,* Opposition, p. 13.]  Therefore, Defendants assert there was no conversion of CB&T's interest and, thus, no damages.   Defendants contend that this establishes that Plaintiff's Section 523(a)(6) claim must fail.

This Court must decide whether the undisputed facts show that Defendants acted willfully within the meaning of Section 523(a)(6) because they had a subjective motive to inflict injury or that they believed the injury was substantially certain to occur as a result of their conduct.

The Ninth Circuit Court of Appeals has described the intent level required for willfulness as follows:

> The holding in *In re Jercich* is clear: §523(a)(6) renders debt nondischargeable when there is either a subjective intent to harm, or a subjective belief that harm is substantially certain. . . . We believe, further, that failure to adhere strictly to the limitation expressly laid down by *In re Jercich* will expand the scope of nondischargeable debt under § 523(a)(6) far beyond what Congress intended. By its very terms, the objective standard disregards the particular debtor's state of mind and considers whether an objective, reasonable person would have known that the actions in question were substantially certain to injure the creditor. In its application, this standard looks very much like the "reckless disregard" standard used in negligence. That the Bankruptcy Code's legislative history makes it clear that Congress did not intend §523(a)(6)'s willful injury requirement to be applied so as to render nondischargeable any debt incurred by reckless behavior,

reinforces application of the subjective standard. The subjective standard
correctly focuses on the debtor's state of mind and precludes application of
§523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge
that harm to the creditor was substantially certain.

*Carrillo v. Su*, 290 F.3d at 1144-46.

The undisputed facts show that Defendants executed an Asset Purchase

Agreement between Spectrum Aluminum and Spectrum Mirror on February 1, 2010.

Spectrum Mirror paid some amount in the range of $25,000.  Some may have been

cash, which the Licursis did not use to pay down the CB&T debt, but disbursed it to the

unsecured creditors of Spectrum Aluminum in total disregard to the security interest

held by CB&T.  Some may have been the assumption by Spectrum Mirror of trade debt

of Spectrum Aluminum.  As a result of this transaction, CB&T was left with little

collateral for its loan – merely some outstanding receivables and work-in-progress worth

an undisclosed amount.  And even those remaining assets were later dissipated and

never identified to the CB&T lien or paid to CB&T.  The assertion that there was

replacement collateral is fallacious since that supposed collateral (the $25,000 +/- paid

by Spectrum Mirror) was used for other purposes and any secured interest that CB&T

may have had evaporated when it was disbursed to other creditors.

Based on the facts presented to this Court, Defendants never disclosed the asset

transfer to CB&T.  Further, in December 2010, the Licursis submitted letters on

Spectrum Aluminum letterhead with attached financials for Spectrum Aluminum to

CB&T which make no reference to the asset transfer to Spectrum Mirror or of the

Defendants' intention to dissolve Spectrum Aluminum under the laws of Delaware.  All

of this occurred when Spectrum Aluminum was in default to CB&T under its loan.

The transfer of the assets from Spectrum Aluminum to Spectrum Mirror and the

Defendants' continued failure to disclose this transfer to CB&T brings the Court to

conclude that the transfer of the assets was an attempt to keep the assets out of

CB&T's reach should a judgment ultimately be entered against Spectrum Aluminum and

to allow the Licursis to operate Spectrum Mirror without regard to the CB&T lien.  It is

clear that the Defendants intended to remove the collateral from the reach of CB&T and

to make sure it would not be able to collect on any future, possible judgment.

Although it appears that the creation of Spectrum Mirror was actually triggered by

the Vision Builder Group judgment and the suspension of Spectrum Aluminum's

contractor's license, it had to be clear to the Licursis that CB&T would necessarily suffer

injury because the Licursis hid this transfer, used the Spectrum Aluminum assets to pay

off lower priority creditors, did not give CB&T a lien on Spectrum Mirror's assets, and

misrepresented the assets of Spectrum Aluminum.

Therefore, the Court finds that based on undisputed findings and by a

preponderance of that evidence it is clear that Defendants had a subjective motive to

inflict injury on the Plaintiff and therefore the willfulness element for a Section 523(a)(6)

claim has been satisfied.


**Ruling:**

Based on the foregoing, the Court determines that there are no genuine issues of

material fact and that Plaintiff is entitled to summary judgment as to **liability** on each of

its § 523(a) claims as follows;

Summary judgment is granted as to liability under §523(a)(2)(A) as to Susan

Licursi and John Licursi;

Summary judgment is granted as to liability under §523(a)(2)(B) as to Susan

Licursi and John Licursi;

Summary judgment is granted as to liability under §523(a)(4) as to John Licursi;

Summary judgment is granted as to liability under §523(a)(6) as to Susan Licursi and John Licursi

Liability of Susan Licursi under §523(a)(4) has yet to be resolved as no evidence of her status within Spectrum Aluminum is in the record.

The measure of damages has yet to be resolved.  There is insufficient undisputed evidence to determine this issue.  CB&T insists that the entry on the financial statements valuing the Licursi investment in Spectrum Aluminum at $500,000 means that Spectrum Aluminum had assets worth $500,000 in 2009 and 2010.  While this was clearly misleading and led CB&T to believe that Spectrum Aluminum was still an operating company with a going concern value in that amount, it is not relevant for valuing the actual assets of Spectrum Aluminum at the time of the sale to Spectrum Mirror.

###

Date: July 12, 2017

_____
Geraldine Mund
United States Bankruptcy Judge