**FILED & ENTERED**

DEC 12 2018

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY** Gonzalez **DEPUTY CLERK**

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>John Michael Licursi<br>Susan Annette Licursi<br><br>                                    Debtor(s).<br><br>_____<br><br>Zions Bancorporation, N.A. dba<br>California Bank & Trust<br><br>                                    Plaintiff(s),<br>       v.<br><br>John Michael Licursi, Susan Annette<br>Licursi<br><br>                                    Defendant(s). | CHAPTER 7<br><br>Case No.:  1:10-bk-26168-GM<br>Adv No:    1:15-ap-01236-GM<br><br>**MEMORANDUM OF OPINION GRANTING NONDISCHARGEABLE JUDGMENT PURSUANT TO 11 U.S.C. §523(a)**<br><br>Date: September 26, 2018<br>Time: 9:00 a.m.<br>Courtroom:   303 |

   Plaintiff ZB, N.A. dba California Bank & Trust ("Plaintiff" or "CB&T") filed this adversary proceeding against John and Susan Licursi ("Defendants," "Debtors," or the "Licursis" and individually "John" and "Susan").  CB&T seeks a non-dischargeable

-1-

judgment under 11 U.S.C. §523(a). On July 12, 2017, the Court granted summary judgment on liability as to Susan under §523(a)(2)(A), §523(a)(2)(B), and §523(a)(6) and as to John under §523(a)(2)(A), §523(a)(2)(B), §523(a)(4), and §523(a)(6).[1] The remaining issues are whether Susan is liable under §523(a)(4) and the measure of damages.

On September 26, 2018, the Court held the final piece of the trial on this adversary proceeding. The parties had until October 31, 2018 to file closing briefs (if they wished to do so) and then until November 15 to file responsive briefs. They stipulated to extend that until November 9 for closing briefs and November 30 for reply briefs.

No evidence was proffered that showed that Susan Licursi held a position within Spectrum Glass & Aluminum, Inc. ("Aluminum" or "Spectrum Aluminum") that subjected her to liability as a fiduciary. Thus, the Court is granting judgment to Susan Licursi under §523(a)(4).

## THE MEASURE OF DAMAGES

§523(a)(2)(A), §523(a)(2)(B)[2] – Among the required elements for proving §523(a)(2)(A) and §523(a)(2)(B) is that the plaintiff sustained damages as a proximate result of the false representations. The debt is non-dischargeable "to the extent obtained" by the misrepresentation, fraudulent omission, or deceptive conduct. When the creditor forebears in its collection of the debt, that can be seen as an extension of credit.

Section 523(a)(2) bars the discharge of all liability arising from the fraud. This may include attorney's fees and costs as well as other damages obtainable under applicable law:

> In short, the text of § 523(a)(2)(A), the meaning of parallel provisions in the statute, the historical pedigree of the fraud exception, and the general policy

---

[1] Dkt. 48, 49
[2] Discussed in depth in dkt. 48, p. 18, *et. seq*

underlying the exceptions to discharge all support our conclusion that "any debt . . . for money, property, services, or . . . credit, to the extent obtained by" fraud encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor. Under New Jersey law, the debt for fraudulently obtaining $31,382.50 in rent payments includes treble damages and attorney's fees and costs, and consequently, petitioner's entire debt of $94,147.50 (plus attorney's fees and costs) is nondischargeable in bankruptcy.

*Cohen v. De La Cruz*, 523 U.S. 213, 223 (1998). Thus, if CB&T is entitled to its attorney's fees in a fraud action, those will not be dischargeable under §523(a)(2).

The question is whether California law or Federal Law controls in determining that entitlement. Judge Jury stated in *Daniel v. Del Valle* that §523(a)(2) is based on common law fraud, so it is logical that the measure of damages would be under the theory of common law fraud. *Daniel v. Del Valle (In re Del Valle)*, 577 B.R. 789, 810 (Bankr. C.D. Cal. 2017). She noted that, following the holding in *Field v. Mans*, 516 U.S. 59, 70 (1995), many federal courts look to the Restatement of Torts, rather than state law, as the guide for damages under §523(a)(2). 577 B.R. at 810. However, *Cohen* uses New Jersey law to determine damages. To some extent it may be a question of whether (i) the proceeding is to declare a pre-existing state court judgment to be non-dischargeable or (ii) both the liability and damages are tried in a federal court. But this is not clear.

Under California law, CB&T would not be entitled to its attorney's fees in this action. The California Civil Code provides generally

> For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.

Cal. Civ. Code § 3333 (West). Although contract damages may include attorney's fees if the contract so provides under California Civil Code §1717, a "tort action for fraud arising out of a contract is not, however, an action 'on a contract' within the meaning of [Civil Code section 1717]." *Stout v. Turney*, 22 Cal. 3d 718, 730 (1978). Thus, even if

there is an attorney's fee clause in the underlying contract, attorney's fees are not recoverable in a tort action unless specifically covered by statute. While there are a variety of statutes that allow fees or even punitive damages, the present case does not fall under any of them, although costs may be claimed through a bill of costs. Cal. Code Civ. Proc. §1021. To recover attorney's fees and other expenses for a fraud action, California law requires that there be a preexisting relationship with an attorney's fees clause that is written broadly enough to cover the prevailing party in a fraud action. *Daniel v. Del Valle*, 577 B.R. at 815. But in this case, although the loan agreements do include an attorney's fee provision that is rather broad, the Debtors are not parties to those agreements, which are solely with Spectrum Aluminum. And while there may have been personal guaranties by the Licursis, these are not in evidence in this case.

Federal law would provide a similar outcome. The Restatement 2d of Torts states:

> (1)  The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including
>
> > (a)  the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
> >
> > (b)  pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.
>
> (2)  The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

Restat. 2d of Torts, § 549. While the Restatement is not specific as to the recovery of the fees and costs incurred in a lawsuit brought under fraud, it does not appear that CB&T would be entitled to an award for the attorney's fees for pursuing this action under §523(a)(2). *See also* Restat. 2d of Torts, § 914(1) ("The damages in a tort action do not ordinarily include compensation for attorney fees or other expenses of litigation.")

Thus, in this case, CB&T is entitled to the value of its collateral in April 2010, which was the time of the transfer to Spectrum Glass & Mirror, Inc. ("Mirror" or "Spectrum Mirror"). CB&T is also entitled to any ascertainable damages for the delay from the time of the transfer until 2013 when CB&T sought recourse against Mirror. There is no evidence of the damages caused by that delay and thus no award will be given for that.

§523(a)(4)[3] – One of the required elements of §523(a)(4) is that the debt itself had to be caused by fraud or defalcation. In this case, the wrongful act was the transfer of the assets of Aluminum without paying CB&T and without CB&T's knowledge. Neither California law nor the Restatement of Torts creates special damages that would apply to this case. *Pederson v. Kennedy*, 128 Cal. App. 3d 976 (Cal. Ct. App. 1st Dist. 1982); Rest. 2d of Torts §874. In this case the measure of damages would be the same as those under §523(a)(2).

§523(a)(6)[4] – The debt itself must be for willful and malicious injury by the debtor to CB&T or the property of CB&T. There is no agreement on whether the measure of damages is the balance owing on the note or the value of the collateral at the time of the injury. *See Oakwood Acceptance Corp. v. Coltrane (In re Coltrane),* 273 B.R. 478, 480 (Bankr. D.S.C. 2001). This Court finds that it is appropriate to look to the extent of the injury – in this case the misuse of the CB&T collateral and the delay to CB&T in obtaining (and collecting) a judgment against Mirror - not to any deficiency on the balance of the original debt owed by Aluminum to CB&T. This theory is the holding in the Fifth Circuit opinion of *In re Modicue:*

> Section 523(a)(6) is based on tort principles rather than contract. *In re Howard*, 6 Bankr. at 258, Collier on Bankruptcy 523.16. It is designed to compensate the injured party for the injury suffered while not allowing the debtor to escape liability for a "willful and malicious" injury by resort to the bankruptcy

---

[3] Discussed in depth in dkt. 48, p. 25, et. seq
[4] Discussed in depth in dkt. 48, p. 33, et. seq

laws. Thus, the appropriate measure for non-dischargeability under § 523(a)(6) is an amount equal to the injury caused by the debtor rather than any other sum owed by the debtor on a contractual basis. In this case, the injury to Friendly is the loss of the collateral securing the Modicue's indebtedness to which Friendly would have had priority upon liquidation of the bankruptcy estate. Therefore, under § 523(a)(6), Friendly is entitled to the value of the collateral denied it by the Modicue's wrongful actions. Any other construction of § 523(a)(6) would allow Friendly, an under-secured creditor, to improve its position in the bankruptcy setting because of the debtor's wrongful conduct. Such a result is contrary to the equities and policy goals embodied in the Bankruptcy Code. *See*, *In re Howard*, 6 Bankr. at 258.

Friendly also claims that the appropriate measure of the injury caused by the wrongful sale of the property is the value of the property at the time it was mortgaged rather than the depreciated value of the property at the time it was sold by the debtor. For the same reasons enumerated above, we reject this contention. The bankruptcy court and the district court correctly concluded that the appropriate measure of the non-dischargeable injury is the fair value at the time the property was sold. As the district court reasoned, any other measure would put Friendly "in a better position because of defendant's misconduct than it would otherwise have enjoyed, [Friendly's] actual loss is the value of the collateral had at the time of the wrongful sale." See *First State Bank of Alsip v. Iaquinta*, 98 Bankr. 919 (N.D. Ill.1989).

*Friendly Fin. Serv. Mid-City, Inc. v. Modicue (In re Modicue),* 926 F.2d 452, 453 (5th Cir. 1991).

As under §523(a)(2) and §523(a)(4), the measure of damages is the value of the collateral transferred in 2010 and any ascertainable damages due to the delay until 2013 when CB&T took action against Mirror. No damages have been shown for the delay.

However, in all three sub-sections of §523(a), if the value of the collateral exceeded the amount of the contract debt, the judgment may not exceed the amount due under the contract since that is the most that the creditor could retain if it had foreclosed on the collateral.

## CALCULATING THE DAMAGES

### Going Concern or Liquidation Value?

As to the damages, the critical issue is the value of the business and assets that were transferred from Spectrum Aluminum to Spectrum Mirror. The background and detail of the transfer are fully described in the Memorandum of Opinion on Plaintiff's Motion for Summary Judgment, which is incorporated herein.[5] In that Memorandum, the Court found

> Moreover, the transfer of the assets [from Aluminum to Mirror] without disclosing the information to CB&T shows Defendants acted intentionally in an effort to prevent CB&T from seeking collection on the obligation while they were able to continue to operate – now under the name of Spectrum Mirror. It can also be inferred that they [sic] only reason that the money received from Spectrum Mirror for the Spectrum Aluminum assets was used to pay unsecured creditors of Spectrum Aluminum was so that those trade creditors would continue to do business with the Licursis operating as Spectrum Mirror.
>
> These wrongful acts necessarily caused injury to CB&T because its collateral was dissipated, Spectrum Aluminum failed to function and Spectrum Mirror took over the business that Spectrum Aluminum had previously conducted.[6]

The testimony and evidence in this portion of the trial bolstered that opinion. The sale of assets from Aluminum to Mirror was thoroughly documented.[7] Testimony and documents show that Spectrum Mirror did not have any initial assets except those that it acquired from Spectrum Aluminum. The sale covered virtually all of the assets of Aluminum except "work in progress," cash and accounts receivable (but it is questionable whether any materials remained to complete that work or whether it was meant to refer to completed work that had not yet been delivered or paid for.)

The initial issue on damages is whether these assets are to be measured based on going concern value (the position of CB&T) or liquidation value (the position of the Licursis). Whether to use going-concern value or liquidation value is determined by the

---

[5] Dkt. 48
[6] Dkt. 48, p. 35:6-16
[7] Exhibits 12, 13, 16, and 17

continued use of the assets. In *Bond v. Kerns*, the District Court for the District of Arizona set forth a concise summary of the law:

> In *In re Taffi*, 96 F.3d 1190 (9th Cir. 1996), the IRS sought to enforce a tax lien on a home that the debtors were going to retain through their plan of reorganization. The Ninth Circuit found that when a Chapter 13 debtor "intends to retain property subject to a lien" and "the proposed use of the property is continued retention by the debtor, the purpose of the valuation is to determine how much the creditor will receive for the debtor's continued possession." *Id*. at 1192.
>
> The Ninth Circuit expanded on *Taffi* in *In re Kim*, 130 F.3d 863 (9th Cir. 1997). In *Kim*, the debtors filed a Chapter 13 bankruptcy plan treating one claimant as partially secured and the other as wholly secured. The claimants argued the debtors had undervalued the collateral securing their claims. The Ninth Circuit instructed that, "In light of *Taffi*," where the debtors "continue to operate the business ... valuation should be based on the use or disposition to be made of the interest, which in this case means the continued operation of the business in the same location." *Id*. at 865. Thus, the court rejected the debtors' attempt to use the liquidation value of their business equipment because the equipment was not going to be sold, but instead used to sustain an ongoing business. *Id*.
>
> A number of other cases, both from this circuit and others, come to essentially the same conclusion: when a debtor plans to continue operation of a business, the business should be valued as a going concern. *See e.g. In re DAK Indus., Inc.*, 170 F.3d 1197, 1199-1200 (9th Cir. 1999) (bankruptcy court properly concluded business was a going concern when it continued to operate during the preference period); *In re Tennessee Chemical Co.*, 143 B.R. 468, 474 (Bankr. E.D. Tenn. 1992) (court applied going concern value even though business had not made a profit in three years, noting "[g]oing concern value means that value is added to the property because it can be operated as a business."); *In re Thomas*, 246 B.R. 500, 505 (E.D.Pa. 2000) ("liquidation value is not a proper measure of a company ... when the business will continue its operations"); *Matter of Prince*, 85 F.3d 314, 319 (C.A.7 (Ill.) 1996) ("[W]here a business is expected to continue as a going concern, the company's expected future earnings from operations often far exceed the liquidation value of the company's physical assets. Thus, when valuing a business that is continuing to operate as a going concern, liquidation value is generally an inaccurate approximation of what shares are worth to shareholders."); *In re McLaughlin*, 217 B.R. 772, 781 (Bankr. W.D.Tex. 1998); *Williams v. Swimlear*, 2008 WL 1805824 (E.D.N.Y.)

*Bond v. Kerns*, 2013 U.S. Dist. LEXIS 184286, *4-6 (Dec. 16, 2013).

Aluminum closed down and Mirror sprang up in its place, taking almost all of its assets and continuing its business, using the same premises, continuing to use the same business and trade name, and enjoying all goodwill of Aluminum.  The sale must be valued as that of a going concern.

### Burden of Proof

The creditor in a §523(a) action bears the burden of proof as to all elements, using a preponderance of the evidence standard.  *Grogan v. Garner*, 498 U.S. 279 (1991); *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000); *Deitz v. Ford (In re Deitz)*, 469 B.R. 11, 24 (B.A.P. 9th Cir., 2012).

### Analysis of the Evidence

The amount paid by Mirror was based on a "walk-though (limited) appraisal" by Credit Management Association, whose purpose was "to determine the current *Forced Auction Value* of the *Company owned assets for you*." (emphasis in the original)[8]  The Debtors did not obtain a going concern value, but Mirror paid the "forced auction amount" of $25,715.[9]  The payment was made by Mirror to some creditors of Aluminum, but not to CB&T, which held a lien on almost all of the assets transferred.[10]

Because the sale was of a going concern, the amounts paid by the Debtors for the transfers can only be used to set a floor as to value in that the value cannot be less than $25,715.[11]

CB&T bases its damages claim on the analysis by its expert, who, indeed, did use the going concern methodology, valuing Aluminum as of December 2009 rather than April 2010 due to the lack of financial data as of the April date.  The Court finds

---

[8] Exhibit 11
[9] Exhibit 13
[10] Exhibits 3, 5 through 8
[11] See discussion below for the actual "floor" amount.

that the time difference is irrelevant and accepts the December 2009 valuation date.

The appraisal is set forth in Exhibit 34, which was never moved into evidence. However, Edward Alvarado of Alvarado Consulting, Inc. testified at length on both direct and cross-examination as to this document and it was attached to the Joint Pretrial Stipulation. It is appropriate that the Court refer to it as if it had been admitted. The Alvarado Report asserts that on December 31, 2009 Aluminum had a fair market value as a going concern of $800,000.

There are three possible approaches to valuing a company: Income Approach, Market Approach, and Cost Approach. The Court is aware from some thirty-four years on the bench that for businesses most appraisers rely on the Income Approach or some combination of the Income and Market Approach. Cost Approach is seldom used except as a check on the other two approaches.

However, in this case the appraiser stated that the Income Approach was too unreliable to use "due to the Company not producing enough historical financial statement [sic]."[12] He also noted inconsistencies and unanswered questions as to the income statements and balance sheets and he testified at length as to the unreliability of these financial statements, and why these prevented him from using the Income Approach.[13]

The appraiser's Cost Approach (referred to as "Asset Approach") used the "Adjusted Net Book Value Method," which presumed that Aluminum's value "will be realized by the hypothetical sale of its assets as part of a going concern." According to the appraiser, this would be $427,000.[14] However, the appraiser expressed his concern about the expenses and liabilities "being run through the business."[15]

Accordingly, the appraiser relied 100% on the Market Approach, looking at what other companies that he identified as "similar" had sold for, while adjusting for the

---

[12] Exhibit 34-7
[13] Exhibit 34-5, 34-6
[14] Exhibit 34-8, 34-12
[15] Exhibit 34-9

realities of Aluminum as compared to these market "comparables." This led to a conclusion of $800,000 as the going concern value.[16]

This approach used glass manufacturing comparables. Thus, to evaluate this market approach, the Court must determine the nature of the business of Spectrum Aluminum – was it a glazing contractor or a glass manufacturer? CB&T asserts that because Aluminum used code 327210 to identify itself on its 2009 Income Tax Return as being in the business of "Glass & Glass Manufacturing," this is dispositive because code 238150 (identifying "Glass and Glazing Contractor") could have been used.[17] The Court will take judicial notice of these codings.[18] In his initial post-trial declaration. Mr. Alvarado clarified his testimony stating that he had, in fact, seen the Spectrum Aluminum tax return. However, the issue of whether Mr. Alvarado reviewed the tax returns and found this code before he prepared his appraisal is not relevant to the accuracy of the appraisal if Aluminum was actually a glazing contractor and not a glass manufacturer.

While the Debtors used the IRS code for glass manufacturer, when they filed their bankruptcy schedules they stated in clear English that the nature of the business of both Aluminum and Mirror is/was "Glass & Glazing Contractor."[19] This, combined with the Licursi testimony at trial, convinces the Court that Spectrum Glass & Aluminum, Inc. was a glazing contractor with a C17 license. This allowed it to install aluminum, calking, and glass. These were fabricated from long pieces which Aluminum purchased from the manufacturer. Aluminum then set in the glass, installed doors, handrails, etc. It did not do stained glass or vehicle glass. Aluminum would buy its glass from the manufacturer, which was the entity that took the huge sheets of glass and then cut them to size. Aluminum would order the sizes and types of glass that it needed and then it would install them. Spectrum Glass & Mirror, Inc. continued this same business.

---

[16] Exhibit 34-8, 34-14
[17] Dkt. 82, p. 5:28-7:12
[18] Dkt. 82, Ex.1 to the declaration of Anthony Napolitano
[19] Case 1:10-bk-26168-GM, dkt. 24, p. 27

As the Court reviews the Standard Industrial Classification Codes in Ex. D, it finds that Aluminum and Mirror could fit under either SIC 3231 or SIC 1793, but probably is closer to the SIC 1793 definition. While SIC 3231 applies to companies that are engaged in "manufacturing glass products from purchased glass," which seems to be part of what Aluminum and Mirror did, they also were "special trade contractors primarily engaged in glass and glazing work." And moreso the latter than the former. The Court does not have any "comparables" for sales under SIC 1793. But Debtors have provided a more detailed printout of the comparables used by Alvarado under SIC 3231. Alvarado did not describe anything about the four companies listed in SIC 3231, though requested to do so on cross-examination.[20]

In their post-trial brief, the Debtors have provided the full information for SIC Code 3231, highlighting the four used by Alvarado for his comparables. Plaintiff objects to the use of Exhibit E to the Licursi Post-Trial Brief as not being properly authenticated. This is correct. However, in his reply declaration, Mr. Alvarado does not dispute the information in Exhibit E and, in fact, accepts it as a true (though incomplete) summary of the Pratt Report that he relied on.[21] The Court is limiting the use of Exhibit E to the names, locations, and company descriptions, whose accuracy Mr. Alvarado does not question.

Two of the four are identified as manufacturers of aquariums or aquarium products, one does glass engraving and retail, and one is a "specialty glass company."[22] Two of these businesses on exhibit 3.1 to the Alvarado report – manufacturers of aquariums or aquarium products -  are clearly not comparable to Aluminum's glazing contractor business. This leaves only the sale of a Northern California "glass engraving and retail" company on 5/20/07 and a Las Vegas "specialty glass company" on 12/16/06[23]. Both of these sales occurred several years before our valuation date. The

---

[20] Transcript, Dkt. 83, 18:25-21:1; 33:10-34:17
[21] Dkt. 86, 5:19-6:18
[22] Ex. 81, Ex. E
[23] Debtors assert that Artistic Glass Specialists, LLC, the "specialty glass company," was a stained glass and leaded glass retailer.  No evidence is provided as to this. Dkt. 81, 4:1

Court finds that the use of these two sales as comparables is unreliable given the paucity of information about the nature of the business of each of them.  Accordingly, the selected market comparables are not comparable at all and this lack of comparability completely undermines the reliability of this Market Approach valuation.[24]

The Court has identified additional flaws in this Market Approach evaluation. The valuation is based on the revenues and EBITDA of Aluminum, but the appraiser testified – as described above - that he did not use the income approach due the lack of historical data and his concerns about the accuracy of the data he did have.[25] Beyond these more fundamental issues, the appraiser said he put more weight on the Revenue calculation than the EBITDA calculation, because of concerns over the income statement.  However, his final $800,000 valuation is closer to the EBITDA figure.[26] He also failed to deduct interest expense in calculating Aluminum's EBITDA.  Further, there are issues raised because Aluminum's books and records were kept on an accrual basis rather than a cash basis, which would have had to be taken into account on the Income Approach.

Since the appraiser did not create an Income Approach analysis, there is no evidence as to what that might have been. Furthermore, the appraiser's reasons for not using the Income Approach – the lack of historical data and concerns about the accuracy of the existing data – preclude the use of this approach.

This leaves only the Asset Approach – Adjusted Net Book Value Method. The Court has a number of issues with the appraiser's $427,000 Asset Approach valuation. It is based on Aluminum's balance sheet, but the appraiser raised questions about this balance sheet in particular (*i.e*., an unexpected decrease in cash and large unexplained current liabilities)[27] and – set forth above – in the more general accuracy of Aluminum's accounting.  Also, the appraiser's adjusted balance sheet includes $839,000 of

---

[24] The Court notes that these businesses are not the glass manufacturers who cut large sheets of glass to specified sizes described by Ms. Licursi, but they are not comparable to Aluminum for other reasons, as noted above.
[25] See Exhibit 34-5
[26] Exhibit 34-13
[27] Exhibit 34-6

accounts receivable,[28] but accounts receivable were not included in the Aluminum assets sold to Mirror.[29]

CB&T has not met is burden of proof; it has not established its damages – the value of its collateral transferred to Mirror - by a preponderance of the evidence.  As a result, the Court can only use the floor of $25,715 – together with interest and costs – as damages.[30]

In its post-trial brief, CB&T argues that CMA's forced sale appraisal did not include all of the assets purchased by Spectrum Mirror, specifically a leased 2006 Chevrolet, trade names and other intangibles, portfolio work of employees, and good will of Spectrum Aluminum.[31]  Respecting the Chevrolet, CB&T has not established that it had a perfected security interest in the vehicle.[32]  If it did, under California law the vehicle could not have been effectively transferred without CB&T's consent.  If it did not have a perfected security interest, then CB&T was not injured by its transfer. Respecting the other mostly intangible assets -  trade names, good will and portfolio work - CB&T has not offered any specific valuation of these assets. There is no line-item for these in the Bank's appraisal.[33]  Nor does Aluminum's balance sheet value these items.[34]  Trade name, portfolio work, good will, or any other intangibles are not listed as line items, and Aluminum's substantial negative equity does not seem to indicate that there could be considerable value in good will and trade names.  Without any viable valuation of these assets in evidence, the Court cannot add them to CMA's valuation.

The Court is aware of the inadequacies of this "forced sale" valuation, but no viable alternative has been established by the preponderance of the evidence.

---

[28] Exhibit 34-12
[29] Exhibit 12-11; see also Exhibit 24-3 (Aluminum's scheduled assets in its Chapter 11 filing included $277,994 of accounts receivable.)
[30] See discussion below as to the actual "floor" amount.
[31] Dkt. 82, p. 2 (Although Ex. 12-11 says that the valuation did include all purchased assets.)
[32] Cal. Veh Code § 6301, 6303
[33] Ex. 34-12
[34] Ex. 18-1

In her reply final brief, Ms. Licursi argues that the Court specifically denied the request for additional declarations, but that Mr. Napoliano and Mr. Alvarado each filed one. She is correct as to the instructions by the Court:

> NAPOLITANO: Will the Court entertain supplemental declarations addressing some of these issues. For example, one that I might think of is the SIC Code.
> JUDGE MUND: Is who?
> NAPOLITANO: The SIC code, the S – I – C code.
> JUDGE MUND: Oh. You know, I don't think so. To be fair, the only way I could do that is to really continue the case for that. OK? I mean, this is what your appraiser chose to use, and he's the expert. So I don't think it would be fair at this point. So, no, we're going to have to deal with what we have in the courtroom.
> NAPOLITANO: Okay[35]

While Ms. Licursi did not submit a supplemental declaration, she did ask the Court to use a process similar to judicial notice to look outside the record at specific information concerning the SIC Codes. This was appropriate because Mr. Alvarado presented only partial information as to the one that he used and this was a basis of his testimony.

In its reply closing brief, Plaintiff again submits additional declarations of Mr. Napolitano and of Mr. Alvarado. Mr. Napolitano seeks to introduce the pretrial requests for production of documents and the responses thereto. To the extent that these are relevant evidence – for the case-in-chief, defense, or impeachment – they were in the possession of the Plaintiff at the time of trial and should have been introduced at that time, not now.

As noted, Mr. Alvarado's initial declaration clarified his testimony in that he had, in fact, seen the Spectrum Aluminum tax return. As to his new declaration, he properly responds to the issues raised by the Licursis in their initial trial brief. It is clear that he followed proper evaluation procedure but was limited to the information provided to him by his client. Thus, he only looked at "glass manufacturers" and other businesses that are not clearly applicable for comparable sales. Also, he reviewed the accounting

---

[35] Transcript, dkt. 83, p. 118:1-9

sheets, which he argues were not done in accordance with proper accounting procedures. But there was never additional discovery as to the meaning of some entries. It was not a requirement of the Licursis to provide financial information that complied with general accepted accounting principles, merely that they be accurate. Additional pre-trial discovery could have uncovered the meaning of items on the financial records and resolved some of the issues raised by Mr. Alvarado in his report. But this did not happen. So, he relied solely on the Market Approach, which was fatally flawed.

## DETERMINATION OF DAMAGES

The Court has before it certain figures of the contract debt owed to CB&T at the time of the bankruptcy, which would have grown due to interest and costs thereafter.

The amount of the judgment against Aluminum and against Mirror are based on contract and thus are not a proper measure of damages for the tort claims of §523(a), although could act as a ceiling once the Court takes into account other costs that were necessitated by the §523(a)(2) actions. Since the Court has no evidence on this, it will use the claim amount of $468,427.41 as the ceiling of damages.

The walk-through appraisal included the cars. The Clark Forklift is not a licensed vehicle and thus CB&T had a security interest in it (appraised at $1,250). But CB&T did not have a security interest in the other four vehicles (jointly appraised at $14,000).[36] The appraisal also did not include glazing materials and supplies, though some or all of these were transferred (with a balance sheet value of $41,500). The balance sheet value is the best piece of available evidence and although some of this may have remained at Spectrum Aluminum to complete work-in-process, there is no evidence of this. Therefore, the Court finds that based on the evidence the amount transferred had a value of $53,715 ($25,715 minus $14,000 plus $41,500). While it is likely that the assets transferred to Spectrum Mirror were worth a great deal more than this, the Court

---

[36] Exhibit 11-10

is limited to the evidence before it and not to speculation as to what might have happened.

Using the floor of $53,715, prejudgment interest in this tort action is allowed since the amount of the damage was readily ascertainable (at least by the Licursis). This is from the date of the conversion. Cal. Civ. Code §3288. In a judgment under §523(a), the "federal prejudgment interest rate applies to actions brought under federal statute, such as bankruptcy proceedings, unless the equities of the case require a different rate. *Banks v. Gill Distrib. Ctrs., Inc. (In re Banks)*, 263 F.3d 862, 871 (9th Cir. 2001). Prejudgment interest is calculated by the federal law "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. §1961(a). Interest is computed daily but compounded annually. 28 U.S.C. §1961(b).

There are no reasons to use the higher state court rate rather than the federal rate prevailing at the time of the entry of the judgment. The award of prejudgment interest is left to the discretion of the trial court and should be governed by considerations of fairness with the end of making CB&T whole. *See, e.g., Purcell v. U.S.*, 1 F.3d 932, 942-943 (9th Cir. 1993). Thus, in calculating prejudgment interest, the Court is using the Treasury yield rate applicable under §1961(a) on April 15, 2010 (the date that the assets were transferred to Mirror), with interest compounding and the rate resetting each April 15 thereafter, as set forth in the chart below.

//
//
//
//
//
//
//

| Pre-Judgment Interest Calculation | | | | |
|---|---|---|---|---|
| Period | Beginning Principal | Interest rate | Interest | Ending Principal |
| 4/15/10 - 4/14/11 | $53,715 | 0.47% | $252.46 | $53,967.46 |
| 4/15/11 - 4/14/12 | $53,967.46 | 0.27% | $145.71 | $54,113.17 |
| 4/15/12 - 4/14/13 | $54,113.17 | 0.19% | $102.82 | $54,215.99 |
| 4/15/13 - 4/14/14 | $54,215.99 | 0.12% | $65.06 | $54,281.05 |
| 4/15/14 - 4/14/15 | $54,281.05 | 0.10% | $54.28 | $54,335.33 |
| 4/15/15 - 4/14/16 | $54,335.33 | 0.22% | $119.54 | $54,454.87 |
| 4/15/16 - 4/14/17 | $54,454.87 | 0.55% | $299.50 | $54,754.37 |
| 4/15/17 - 4/14/18 | $54,754.37 | 1.04% | $569.45 | $55,323.81 |
| 4/15/18 - 12/12/18 | $55,323.81 | 2.07% | $756.15 | $56,079.96 |

Thus, the judgment is for the amount of $56,079.96 ($53,715 plus $2,364.96 in prejudgment interest from April 15, 2010), plus costs in accordance with a bill of costs, should one be filed. This judgment will draw post-judgment interest at the federal judgment interest rate of 2.70 percent.

###

Date: December 12, 2018

Geraldine Mund
United States Bankruptcy Judge